

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

## NO. 2-09-227-CV

IN THE INTEREST OF X.V.,
A CHILD

------------

FROM THE 325TH DISTRICT COURT OF TARRANT COUNTY

------------

# MEMORANDUM OPINION[1]

------------

## I. INTRODUCTION

Appellant Mother appeals from an order appointing Aunt[2] as managing conservator of Mother's son, X.V. In a single compound issue, Mother questions whether the trial court properly applied section 153.131 of the Texas Family Code

---

[1]*See* Tex. R. App. P. 47.4.

[2]The titles of "Mother," "Aunt," and "Uncle," which are used throughout this opinion, describe the person's legal relationship to X.V.

when it appointed Aunt as managing conservator of X.V. and whether there was sufficient evidence to support the trial court's finding that naming Mother as managing conservator would significantly impair X.V.'s emotional or physical development.  We will affirm.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Mother is the mother of X.V., who was eight years old at the time of trial. Twenty-eight months prior to trial, Mother voluntarily transferred possession of X.V. to Aunt so that Mother could enlist in the military.[3]  Mother signed guardianship papers that she found on the internet and set the guardianship term from December 20, 2006 to December 20, 2008.  Before a year had expired but after Mother had learned that she could not get into the Navy or the Army, Mother demanded that X.V. be returned to her.  Aunt filed suit on December 5, 2007, because Mother wanted X.V. back, and Aunt thought that was not in X.V.'s best interest.  Aunt also sought a restraining order because Mother "had a history of kidnapping her kids."

On April 29 and May 1, 2009, the trial court held a hearing to determine whether Mother or Aunt should be named X.V.'s managing conservator.  The trial court heard testimony from Aunt, Mother, Uncle, and the Family Court Services worker who was appointed to perform the social study.  A summary of their

---

[3]X.V.'s father is not involved in his life and is not a part of these proceedings.

2

testimony follows.

### A. Aunt's Testimony

#### 1. Aunt's Background[4]

Aunt testified that she was fifty-two years old at the time of the trial and lived in Tarrant County with her husband (Uncle) and X.V. Aunt was self-employed as an independent contractor who managed health fairs and mobile insurance exams. She testified that she had no criminal record, had never been investigated by CPS, and did not use illegal drugs. Aunt said that she was in Dimmitt visiting relatives when Mother signed a paper giving her guardianship of X.V. because she wanted to join the military. Mother's plan was that she would join the military in order to better her life, pick up a trade, and become stable.

#### 2. X.V.'s Behavior When He Arrived at Aunt's House

When X.V. came to live with Aunt, he was hyperactive and restless and had difficulty sleeping through the night. Aunt also said that X.V. "was rough in personality and behavior. He had social issues. He had a difficult time with his peers. He was easily upset and prone to anger and fights, . . . overall, . . . he could be described as a difficult child." X.V. wanted to eat only Ramen noodles,

---

[4]Although many questions were asked of Aunt about her health, we omit such testimony from the factual background because it is not relevant to the determination at hand: whether appointing Mother as X.V.'s managing conservator would significantly impair his physical health or emotional development. *See* Tex. Fam. Code Ann. § 153.131(a) (Vernon 2008).

3

did not have any sense of organization, and liked to watch horror and combat movies. X.V. at age five knew about alcohol, sexual activity, and how drugs were used. Aunt was concerned about X.V.'s social skills because they were rough and about his sexual knowledge.

### 3. Mother's Visits and Calls

Mother did not come to Tarrant County to visit X.V. from December 2006 to June 2007, and her first phone call occurred during the second month that Aunt cared for X.V. During the next six-month period from June to December 2007, the number of Mother's calls increased, but she did not come to Tarrant County to visit X.V. Aunt, however, made trips to Dimmitt and always allowed Mother to see X.V.

During the six-month period from December 2007 to June 2008, Mother continued to call.

After that, in August 2008, Mother requested that the trial court allow her to speak to X.V., which Aunt said was already allowed, and Mother began calling Aunt's cell and home phones ten to twelve times a day. The trial court also allowed Mother to have supervised visits, but Mother did not visit with X.V. from August through December 2008. Mother's first supervised visit since Aunt filed her petition occurred in March 2009. After Mother started her visits, her phone calls were not as frequent.

### 4. Mother's Employment

4

Aunt said that Mother and X.V. lived with her for approximately seven months when X.V. was an infant and that Mother's employment history when she lived with Aunt ranged from about two to four months. Aunt said that Mother needs to hold a stable job because it would teach her responsibility and "probably" curtail her desire to party.

### 5.    Mother's Child Support

Mother was ordered to pay child support in August 2008, but Aunt testified that she had received only one payment for $187. Aunt believes that based on the fact that Mother has not paid child support, she may not be financially able to care for X.V. Additionally, Aunt said that X.V. is expensive because he eats four meals a day and participates in karate and soccer.

### 6.    Mother's Relationships

Aunt testified that X.V. had seen fights between Mother and Michael A., who was the father of his step-sister M. While X.V. was living with Aunt, he was fearful for M. and felt guilty for not being around to protect her. Aunt also testified that after Mother separated from Michael, Mother and Michael kept kidnapping M. from each other. Aunt said that it was not good for X.V. to continue to be around Michael even though X.V. considered Michael to be his father.[5]

During the six years prior to trial, Mother and X.V. had lived with four

---

[5]X.V. thought that Michael was his father until Mother told him upon their break-up that Michael was not his father.

5

different men. Aunt testified that Mother's relationships were not in X.V.'s best interest and that they significantly impaired his emotional health, safety, and welfare because of the backgrounds of the men that Mother had dated or lived with. However, Aunt admitted that since she had filed suit in December 2007, she had not had the opportunity to observe Mother's habits or dating other than when Aunt had visited Mother.

### 7. Mother's Living Conditions

Aunt testified that Mother had moved at least a dozen times over X.V.'s life. Aunt was concerned about the fact that Mother moves often, that she drinks, and that there was always beer around. Although Aunt had not seen Mother drunk, Aunt thought that she had seen Mother high on marijuana.

### 8. X.V.'s Behavior After Living with Aunt

Aunt said that during the month prior to trial, X.V. was more relaxed and felt more assured that he was not going anywhere and that, in turn, his attitude turned around. Aunt said that X.V. received mostly green marks (good) for his conduct at school and that his ADHD-like symptoms no longer exist.

Aunt described X.V. at the time of trial as a brilliant child who was very loving. X.V. had been absent only two or three days per school year since he had been living with Aunt. X.V. was doing "exceptionally well" in school and had participated in karate, soccer, and swimming.

Aunt said that X.V. loves Mother, M., Aunt, and Uncle. Aunt said that X.V.'s behavior was more regulated at her house but that he was prone to setbacks and that emotional upsets caused him setbacks in school, at home, and with his friends. Aunt said that X.V.'s dietary habits had grown and that he was eating vegetables at almost every meal and was willing to try new foods. Aunt said that X.V. knows that there are rules in place at her house and does his best to follow them. Aunt said that X.V. receives discipline in her home and that he has a set routine. Aunt said that she would describe X.V. as "thriving" now because there is stability in his life. Aunt said that it is important to X.V. that he comes home to the same home; that someone is at home waiting for him; that he has his own room, and that he has his own things that are not lost, given away, or stolen.

### 9. Aunt's Opinion and Recommendations

Aunt said that she would not have filed this lawsuit if she thought that Mother was capable of taking care of and providing for X.V. Aunt said that since they went to court in August, Mother had not shown much change. Aunt wants X.V. to have the basics that a child needs to be a responsible, active member of society and wants him to know that education is important. Aunt does not believe that Mother can provide such a life for X.V. Aunt said that if Mother took some parenting classes and was able to establish a stable home and a stable job, Aunt would be comfortable with letting Mother come back into the role as caretaker of

X.V.

Aunt's main complaints about Mother are her instability and her lack of parenting skills. Aunt admitted that her complaints now are the same ones that she had when Mother dropped off X.V., and Aunt was willing, at that time, for the guardianship to be temporary. Aunt also admitted that it was not part of the original guardianship agreement for Mother to have to prove certain skills in order for X.V. to be returned. Aunt said that she filed suit because she saw the positive changes that had occurred in X.V. and could not return him to Mother's unstable environment.

The trial court asked Aunt what her primary concern was about Mother's having unsupervised visits with X.V., and Aunt said that she was concerned that Mother would involve him "in her routine, in her lifestyle, and the people that she associates with." Aunt said that when X.V. knows that he is going to see Mother, he becomes distracted in school for about a week. She said that X.V. changes if he gets information that he might have to leave his solid life and return to Mother. He becomes unruly and talks back to his teacher, and it is distressing to him. When he feels the instability coming, he reverts and regresses. Aunt said that if Mother could keep X.V. with her and avoid exposing him to her friends and her lifestyle, that might be acceptable, but there was no guarantee that Mother was going to do that because she had not shown signs of changing.

8

### B.	Mother's Testimony

#### 1.	Mother's Background

Mother lived on a farm-to-market road outside Amarillo at the time of trial. She testified at trial regarding her relationships with various men.

Mother said that her relationship with Michael was rocky and that there was conflict because she would not let him discipline X.V. Mother's relationship with Michael involved physical abuse from him more than once a week, but Michael was not abusive towards X.V. Mother said that Michael treated X.V. differently after their daughter M. was born; Michael favored M. During her testimony, Mother admitted that she had been convicted for assaulting Michael.

Mother said that Michael always had a job and supported her, X.V., and M. So when Mother decided to separate from Michael, she had to find a place to live and stayed with family and friends.

After Mother separated from Michael, she spent time at Romero Rivera's home. She had no intention of having a romantic relationship with Rivera, but he made sexual suggestions to her and tried to discipline X.V. Rivera also threw away all of Mother's and X.V.'s belongings, so she left. Mother ultimately asked Aunt to keep X.V. because she was thinking of what was best for him.

At the time of trial, Mother was seeing Felix "Filo" Hernandez, and he had accompanied Mother to some of the visits with X.V. However, Mother said that

she does not intend for Fernandez to be a father figure to X.V.; Mother does not live with him and does not plan to marry him. Mother said that she "had kind of known something" about Fernandez's criminal background but did not know that he had been convicted of a felony until the Family Court Services worker told her. She said that she would not allow Fernandez to be around X.V. if X.V. was returned to her.

### 2. Mother's Plan for the Guardianship

Mother testified that she had intended to reunite with X.V. after she joined the military. However, after she found out that she could not get into the Navy or the Army, she demanded possession of X.V. from Aunt. Mother said that her plan was for X.V. to finish the fall 2007 semester in Fort Worth and then have him come live with her. But because Aunt was not letting Mother know what was going on with X.V., Mother demanded him back sooner than the end of the semester, which resulted in Aunt's filing suit.

### 3. Employment

Mother said that after she left X.V. with Aunt, she went to work at Swift for two or three months until she went to jail for violating a protective order when she went to visit M. at Michael's. Mother's employment with Swift was thereafter terminated because she was not able to call in from jail and because Swift did not

tolerate no-shows.

Approximately two months after that, Mother bartended at a restaurant called Paloma's for a week or two before she found a day job at Affiliated. Mother left Affiliated after two weeks because she was having to lift heavy loads, and the pay was not worth it.

A couple of months after she left Affiliated, Mother went to work at Super 8 for a couple of months. Mother left Super 8 because of having to miss work to come to Fort Worth.

A couple months after that, Mother started working at ABC Cleaning. At the time of the trial, Mother testified that she was still working for ABC Cleaning and was making $8 an hour but that she was looking for full-time employment. Mother said that her last full-time job was in 2005 to 2006 and that coming to Fort Worth during the months before the trial had made it difficult for her to keep a job because she had to keep asking for time off.

Mother's pay stubs showed that she had made $796 to date. Mother had used the money to pay for a social study, her attorney's fees, and one child support payment. Mother said that she had been off and on food stamps.

Mother said that she cannot afford to move to Fort Worth and that she has responsibilities to visit M. where she is living. Mother admitted that she could not financially support a child with the work hours that she was currently getting.

11

Mother said that in light of her current circumstances, it would not be easy for her to take care of X.V. without someone's help.[6] But Mother said that she could provide X.V. with the necessities.

### 4.    Child Support

Mother admitted that the trial court had ordered her on August 22, 2008 to pay $187 per month in child support and that she was not paying it.   Mother said that she could not pay the $187 per month because she did not get enough hours at her job.   Mother admitted that since she has been working at ABC Cleaning, she has not had a car payment or a house payment but that she has not paid child support.   Mother said that she had not asked her friends for help in paying her child support.

### 5.    Jail

As mentioned above, Mother spent time in jail on August 22, 2006, for violating a protective order and spent several days in jail for traffic tickets.

### 6.    Drugs

Mother said that she quit using marijuana after it was reported in the 2006 CPS report.   Mother, however, later admitted that she had used drugs on one occasion since then.   Mother testified that she is not an alcoholic or a drug addict.

### 7.    Mother's Living Situation

---

[6]Mother said that she could not support X.V. when she was by herself during the year before trial but that now she had a friend, Fernandez, who could help her.

Mother said that when she was working at Super 8, she was living with a person named Jesus. After that, she lived at a hotel for a month but stayed six nights with Fernandez's sister.

Mother said that during the six months prior to the trial, she had rented her own place and was trying to "keep up with a job." Around January 2009, Mother started living in the trailer where she currently lives. Mother was in the midst of remodeling the trailer and said that the remodeling counted as her rent. Mother admitted that her living situations were not the best for X.V. Mother also admitted that it was best for X.V. to remain in the situation where he was thriving, had a comfortable home and friends, and was making good grades until Mother could establish a job and a home with which she was satisfied.

### 8. If X.V. Lived With Mother

Mother said that the bus would take X.V. to school if he lived with her. Mother knew that there were daycare centers in Amarillo, but at the trial in May 2009, she admitted that she had not attempted to get into a program that would help pay for X.V.'s summer care.

Mother said that she loves X.V. and that she intended for Aunt's care of X.V. to be only temporary. Mother admitted that her bond with X.V. was not as strong as it was before he went to live with Aunt, but Mother thought that the bond would get stronger if he lived with her again.

13

## C. Uncle's Testimony

Uncle testified that he had an incident with Fernandez while X.V. was present. Mother started accusing Uncle, and Uncle told Mother that if she had been a better mother, she would still have X.V. Thereafter, Fernandez started to pick a fight with Uncle and began threatening him. When Fernandez continued to threaten Uncle, he and X.V. left.

Uncle also testified that he believes that moving X.V. would significantly impair his emotional health, safety, and welfare.

## D. The Social Study

James Gottlich, who was employed by Family Court Services, performed the social study in this case.[7] He visited Aunt's home and Mother's home and conducted interviews with various people connected to the case.

### 1. What the Interviews Revealed

Gottlich's understanding was that Mother's placement of X.V. with Aunt and her husband in December 2006 was purely voluntary. Mother left X.V. with Aunt because Mother was going to enlist in the Navy; however, Mother could not get into the Navy because she had charges against her and was on probation when she tried to enlist.

Gottlich understood from Aunt that X.V. had some problems when he came

---

[7]The parties stipulated that Gottlich is an expert in social work.

to live with them. He sensed "that there's a little bit of roughness about" him. Gottlich said that X.V.'s "roughness" did not rise to the level of an emotional or physical developmental impairment. Gottlich believes that X.V.'s roughness could be the result of having seen rough behavior in the past; Gottlich thought that X.V. had scars from his "previous life." Gottlich described X.V. as energetic, very vigilant, and very territorial and said that X.V. had "a very strong personality," but Gottlich would not describe X.V. as a bully.

X.V.'s room at Aunt's house was appropriate, and the house seemed appropriate for an eight-year-old child. According to Gottlich, Aunt has met X.V.'s needs for food, clothing, and shelter, as well as his financial and emotional needs "[v]ery appropriately."

When Gottlich interviewed Mother, he said that Mother tended to minimize some issues. For example, Mother told Gottlich that she and her youngest child's father "had a conflicted relationship off and on," but X.V. told Gottlich that he witnessed "some pretty violent things" between Mother and Michael. Also, Mother mentioned CPS involvement in a cursory way, but she did not mention that there was a family safety plan. Gottlich later learned that there were several CPS reports made against Mother in 2006, but only the insufficient supervision of X.V. and M. by Mother and Michael was found to be "reason to believe." Gottlich also learned that there was "a pretty extensive safety plan" and that Mother did not

follow it; she simply left, giving M. to Michael and X.V. to Aunt. Gottlich did not recall noting that Mother had inflicted any physical abuse on X.V., but Gottlich testified that Mother had done some things that could be harmful to X.V.[8]

With regard to her relationships with men, Mother said that she met Michael in the summer of 2001 and almost immediately began cohabitating with him. They separated in November 2006. Mother has had a "conflicted relationship" with Michael; Gottlich understood that Mother was trying to work something out with Michael so that she could see M. and was paying Michael child support. Gottlich was aware that Mother had an offense for assault causing bodily injury to a family member (Michael).

Mother mentioned a paramour named Fernandez, whom she said she was seeing but not living with. Mother provided Fernandez's birth date, which allowed Gottlich to obtain a copy of his criminal record. Gottlich said that Fernandez's criminal record listed the following offenses in its offense summary: aggravated assault with a deadly weapon, assault causing bodily injury to a family member, theft by check of property greater than $20 and less than $500, evading arrest, bail jumping and failure to appear, interference with emergency call, driving while license suspended, and driving while license invalid. Gottlich investigated

---

[8]For instance, Gottlich stated in his report that Mother had reported on December 5, 2006 that she used marijuana two to three times a month, with use one week prior to the October 9, 2006 screening.

Fernandez because it was reported that Mother was reliant upon or accepted assistance from him and his family; that they were involved in her life; and that she had frequent contact with him, his family, and his extended family. Fernandez told Gottlich that Mother could stay with him.

When Gottlich went to Mother's trailer, there was a dresser in X.V.'s bedroom, along with a bed, and it appeared to be an appropriate bedroom. There was nothing in Mother's house that was reported as an imminent danger to X.V. X.V. told Gottlich that he only owned a dresser once before while living with Mother; usually, he had only a bag for his possessions. Gottlich's report states that Mother had allowed X.V. to be absent more than fourteen days from school; Mother told Gottlich that the absences did not apply to X.V. because he was in pre-K, but the principal countered through CPS that X.V. was in kindergarten, and so the absences counted. Based on his interview with X.V. and the parties, Gottlich formed the impression that X.V. moved around a lot.

The August 22, 2008 orders required Mother to have supervised possession through Family Court Services. Mother's first visit with X.V. was March 8, 2009, because she said that she never received the letter telling her to come for supervised visitation. Gottlich observed a visitation and saw Mother demonstrate appropriate behavior. It appeared that Mother loves X.V. and that he loves her. They had "happy banter" about X.V.'s eighth birthday. During the approximately

five years that X.V. lived with Mother, Gottlich assumed that X.V. had developed a mother-child relationship with Mother.

### 2.    Gottlich's Concerns

During Gottlich's visit to Mother's home, he had concerns about its isolation. He did not see evidence of other people when he was there, and the school was "some distance" from where she lived.   Gottlich also noticed that Mother was in the process of repairing the trailer and that there was standing water at the plumbing outside the trailer, that the kitchen was not totally put together, and that the master bathroom was under construction.   Gottlich saw evidence that some recent repairs had been completed, and there was one fully functional bathroom.

Gottlich also was concerned that Mother was in a period of transition because she had held different jobs over the past several years and was employed at the time of trial doing "cleanups of trailers" and was seeking employment that would provide benefits.[9]   Gottlich was uncomfortable with the lack of consistency of Mother's trying to improve her life and said that he would not want to put an eight-year-old child in a position where so much transition was possible.   Gottlich believed that it is damaging to the emotional health, safety, and welfare of a child to

_____

[9]The only employment history that Mother gave Gottlich was that she had worked at Wal-Mart from April 2006 to May 2006 and that she had worked at Smith Personnel from May 20, 2005, until March 18, 2006.   Mother may have mentioned other employment, but Gottlich was not able to verify any other jobs at the time of his report.

move frequently, and he believed that X.V. might regress significantly if he was placed back with Mother because for two years, X.V. had lived in a very stable environment and had progressed academically and emotionally.

Gottlich reported that "[M]other seems to continue to struggle with parenting issues" and that Mother and Michael were still "arguing and acting inappropriately with one another . . . includ[ing] inappropriate behaviors in front of the children." Gottlich's report stated that X.V. observed fights between Mother and Michael in which they were each pulling on an arm, and Mother threw a large television into a wall. Gottlich believed that kind of behavior is damaging to the emotional health, safety, and welfare of a child because it is scary. Gottlich testified that removing a child from an environment in which there is domestic violence and in which there is a convicted felon is in the child's best interest.

Moreover, Gottlich was alarmed when Mother's drug test results were much higher than the cutoff for marijuana. And Gottlich believed that Mother had minimized information. He reported that she

> was not fully forthcoming as she discussed her life history. She failed to mention the significant involvement of Child Protective Services (CPS) in her life and the lives of her children. She did not identify that she had been incarcerated in jail following a domestic violence incident in September of 2006. Instead of working toward completion of the family plan, she instead "voluntarily" placed each child, and failed to cooperate according to CPS. The mother never took advantage of the services offered that would potentially assist her in becoming a more competent parent.

19

Gottlich, however, had no concerns about Aunt or Uncle raising X.V. Gottlich therefore testified that it would significantly impair the emotional health, safety, and welfare of X.V. if he was removed from his current environment.

### 3. Gottlich's Recommendations

Gottlich testified that, based on the home study, he could not recommend that the trial court place X.V. back with Mother. Gottlich recommended that X.V. continue to live with Aunt and that Mother continue to have supervised visitation like the trial court ordered in the latter part of 2008. Gottlich said that for Mother to have unsupervised visitation, she should move to the Fort Worth area and try to reintegrate into X.V.'s life more; if she lived closer, Gottlich thinks that she could see her son in a more natural environment and possibly "learn some things." Gottlich testified that if Mother was able to establish a stable home (preferably in Fort Worth), pass drug tests, and do everything that a typical mother would do, he would then recommend that she have more access to and possession of X.V. because those changes would improve Mother's competency as a parent and would ultimately benefit X.V.

### E. Trial Court's Disposition

At the conclusion of the hearing, the trial court ordered Mother to take a hair follicle drug test. Mother's attorney sent the trial court the results of Mother's drug test, which revealed that she tested negative for all substances.

20

The trial court thereafter issued a letter ruling appointing Aunt as X.V.'s sole managing conservator. The letter ruling appointed Mother as possessory conservator and provided that she could have supervised visitation with X.V. This appeal followed.

## III. Sufficient Evidence of Impairment to Support Trial Court's Decision

In her single compound issue, Mother questions whether the trial court properly applied section 153.131 of the Texas Family Code when it appointed Aunt as managing conservator of X.V. and whether there was sufficient evidence to support the trial court's finding that naming Mother as managing conservator would significantly impair X.V.'s emotional or physical development. We construe Mother's compound issue as a challenge to whether the trial court abused its discretion by concluding that the evidence was legally and factually sufficient that Aunt had rebutted the parental presumption set forth in Texas Family Code section 153.131(a).

### A. Standard of Review

We give wide latitude to a trial court's decision on custody, control, possession, and visitation matters. *Earvin v. Dep't of Family & Protective Servs.*, 229 S.W.3d 345, 350 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (citing *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982)). We will not reverse a conservatorship finding unless the record demonstrates that the trial court abused

its discretion. *See In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007); *Whitworth v. Whitworth*, 222 S.W.3d 616, 622–23 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (op. on reh'g). Under an abuse of discretion standard, challenges to the legal and factual sufficiency of the evidence are not independent grounds of error; rather, they are simply factors in assessing whether the trial court abused its discretion. *Gardner v. Gardner*, 229 S.W.3d 747, 751 (Tex. App.—San Antonio 2007, no pet.).

In determining whether there has been an abuse of discretion because the evidence is legally or factually insufficient to support the trial court's decision, we engage in a two-pronged inquiry: (1) Did the trial court have enough information upon which to exercise its discretion; and (2) did the trial court err by applying its discretion? The traditional sufficiency review comes into play with regard to the first question. *In re W.M.*, 172 S.W.3d 718, 725 (Tex. App.—Fort Worth 2005, no pet.); *In re T.D.C.*, 91 S.W.3d 865, 872 (Tex. App.—Fort Worth 2002, pet. denied). With regard to the second question, we determine, based on the elicited evidence, whether the trial court made a reasonable decision. *W.M.*, 172 S.W.3d at 725; *T.D.C.*, 91 S.W.3d at 872.

Findings of fact entered in a case tried to the court have the same force and dignity as a jury's answers to jury questions. *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991). The trial court's findings of fact are reviewable

22

for legal and factual sufficiency of the evidence to support them by the same standards that are applied in reviewing evidence supporting a jury's answer. *Ortiz v. Jones,* 917 S.W.2d 770, 772 (Tex. 1996); *Catalina v. Blasdel,* 881 S.W.2d 295, 297 (Tex. 1994). When findings of fact are filed and are unchallenged, they occupy the same position and are entitled to the same weight as the verdict of a jury; they are binding on an appellate court unless the contrary is established as a matter of law or there is no evidence to support the finding. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986); *Rischon Dev. Corp. v. City of Keller*, 242 S.W.3d 161, 166 (Tex. App.—Fort Worth 2007, pet. denied), *cert. denied*, 129 S. Ct. 501 (2008).

## B.    Parental Presumption

There is a strong presumption that the best interest of a child is served if a natural parent is appointed a managing conservator. *Whitworth*, 222 S.W.3d at 623; *see also* Tex. Fam. Code Ann. § 153.131(a). Section 153.131 provides that a parent shall be appointed sole managing conservator unless the court finds that appointment of the parent or parents would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development. Tex. Fam. Code Ann. § 153.131(a).

For the court to award managing conservatorship to a non-parent under section 153.131, the non-parent must prove a significant impairment by a

preponderance of credible evidence. *Whitworth*, 222 S.W.3d at 623; *see also* Tex. Fam. Code Ann. § 105.005 (Vernon 2008) ("Except as otherwise provided by this title, the court's findings shall be based on a preponderance of the evidence."); *J.A.J.*, 243 S.W.3d at 616. There must be evidence to support the logical inference that some specific, identifiable behavior or conduct of the parent will probably cause that harm. *Whitworth*, 222 S.W.3d at 623. Indeed, the non-parent must offer evidence of specific acts or omissions of the parent that demonstrate that an award of custody to the parent would result in physical or emotional harm to the child. *Lewelling v. Lewelling*, 796 S.W.2d 164, 167 (Tex. 1990); *Whitworth*, 222 S.W.3d at 623.

An adult's future conduct may be somewhat determined by recent past conduct; however, evidence of past misconduct, in and of itself, may not be sufficient to show present unfitness. *Whitworth*, 222 S.W.3d at 623. Specific acts or omissions of a parent implicating a significant impairment to a child's emotional development may be inferred from direct evidence. *Id.* However, this link between the parent's conduct and harm to the child may not be based on evidence that merely raises a surmise or speculation of possible harm. *Id.*

## C. Evidence of Significant Impairment

Here, the trial court made fifteen findings of fact based on the social study and the testimony at trial:

1. [X.V.] has been subjected to an environment that would impair [his] physical health or emotional development while in the care, custody and control of [Mother].

2. While living in Washington [Mother] attempted to teach [X.V.] to swim. At the direct instruction of [Mother], [X.V.] took off his life jacket, immediately sank and tried to crawl up the walls of the swimming pool. He lost consciousness and [Mother] had to retrieve him from the bottom of the swimming pool. He stated that this was a very scary experience.

3. [Mother] has been negligent in the supervision of [X.V.] and his sister. She left him and his sister with a baby-sitter who did not watch them appropriately. [X.V.] and his sister were injured by another child because of [Mother's] negligence.

4. [Mother] has a history of violent behavior. By her own admission she had an assault by contact and violation of a protective order. Records show that she was convicted of a subsequent [violation of a] protective order.

5. [Mother] did not provide a proper residence for [X.V.] in that [X.V] frequently saw fighting between his [Mother] and his step-sister's father, MICHAEL [A.], while at that residence. This was an environment in which the police were called frequently. Specifically, [X.V.] saw [Mother] being dragged across the concrete by MICHAEL [A.], [Mother] throw a television set and beer bottles at MICHAEL [A.], and MICHAEL [A.] being dragged across the concrete by the police. [X.V.] has had to call 911 on at least one occasion to report domestic violence.

6. [Mother] was often unable to provide [X.V.] with some basic items. She was able to provide him with a dresser only once. He usually had only a bag for his possessions.

7. She was incarcerated in the Amarillo City Jail on August 22, 2006, which made it impossible for her to provide for [X.V.]

8. [Mother] has a long history of drug use. She tested positive for a drug screen on October 9, 2006, even though she

25

reported her last drug use as being two to three months ago. . . .

9. On December 5, 2006 she reported her last drug use as being two months ago, with her last use a week before her October 9, 2006 drug screen.

10. [Mother] allowed [X.V.] to be absent from school for more than 14 days during kindergarten, which is more than the number allowed.

11. [Mother] has refused to cooperate with the Department of Protective and Family Services. A plan developed for her to complete was closed because she did not complete it. The report states: "Case is being closed due to both children being in protective services and [Mother] signing a guardianship for [X.V.] to [Aunt]. Both children are safe, and [Mother] is not cooperating with services. Case was staffed with PD Davis and Supervisor Campbell who agreed with case closure due to children being protected and mom not cooperating. The report also stated the mother moved from the agreed upon housing, to the home of Sam Fernandez. And that she was planning to enlist in the United States Navy.

12. [X.V.] is afraid that his mother will receive custody.

13. [Mother] has inconsistent employment and housing, and continues to place a man before the best interest of her children.

14. [Mother] is not forthcoming, and would not or could not get the man that she is involved with to present himself for an interview.

15. [Mother] has not followed the court order by paying child support on a monthly basis since September 1, 2009. She has made just one payment.

On appeal, Mother challenges only findings of fact number 1, 2, 3, 4, 6, 7, 8, a portion of 11, the last portion of 13, and 14. However, Mother did not challenge all of the findings of fact, including that she did not provide a proper residence for

26

X.V., that X.V. had been absent fourteen days from kindergarten, that her employment and housing had been inconsistent, that X.V. was afraid that Mother would receive custody, and that she had made only one child support payment. Nor did Mother establish the contrary as a matter of law; instead, the testimony at trial bore out these findings of fact. Consequently, these findings of fact are binding on this court and support the trial court's judgment. *See McGalliard*, 722 S.W.2d at 696; *Rischon Dev. Corp.*, 242 S.W.3d at 166; *Wimpey v. Wimpey*, 662 S.W.2d 680, 682–83 (Tex. App.—Dallas 1983, no writ) (holding that information in social study, which came in without objection, supported trial court's judgment appointing grandparents as managing conservators).

Moreover, Mother did not work her CPS service plan and admitted that she could not financially support X.V. on the number of hours that she was currently being given at work; that she was still looking for full-time employment with benefits; that she was still working on her home; and that until she could establish a job and a home with which she was satisfied, it was best for X.V. to remain in the situation in which he was thriving, had a comfortable home and friends, and was making good grades.

Based on the record, the trial court had enough information on which to exercise its discretion. The record—which included the social study and testimony from Aunt, Mother, Uncle, and Gottlich—demonstrated that appointing

Mother as managing conservator of X.V. would significantly impair X.V.'s physical and emotional development due to the instability present in Mother's environment. *See Lewelling*, 796 S.W.2d at 167 n.4 (stating that the supreme court has noted that "the act of a parent in placing a child in an unstable environment is the very type of conduct that the Legislature contemplated would significantly impair the physical or emotional development of a child"); *Lopez v. Dep't of Family & Protective Servs.*, No. 01-08-00111-CV, 2008 WL 4367588, at *7–8 (Tex. App.—Houston [1st Dist.] Sept. 25, 2008, pet. denied) (mem. op.) (holding that it was within trial court's discretion to find that appointing father as the children's managing conservator would significantly impair their physical and emotional development because record disclosed, among other facts, that father was unable to maintain stable employment and housing and failed to comply with service plan); *In re B.P., Jr.*, No. 02-07-00251-CV, 2008 WL 2639264, at *6 (Tex. App.—Fort Worth July 3, 2008, no pet.) (mem. op.) (holding that it was within trial court's discretion to conclude that appointing mother as managing conservator of child would significantly impair child's physical and emotional development because mother exhibited inconsistent behavior and an inability to do what was asked to regain custody and because child with disabilities had extreme need for structure and stability).   Because sufficient evidence exists that appointing Mother as managing conservator of X.V. would significantly impair X.V.'s physical and

28

emotional development, we therefore hold that the trial court did not abuse its discretion by concluding that Aunt had overcome the parental presumption by proving that appointing Mother as X.V.'s managing conservator would cause X.V. significant impairment by a preponderance of credible evidence. *See Whitworth*, 222 S.W.3d at 623; *Ray v. Burns*, 832 S.W.2d 431, 434–35 (Tex. App.—Waco 1992, no writ) (holding that evidence was legally and factually sufficient to show that appointing mother as managing conservator would significantly impair child when record disclosed mother's unstable, disorganized, and chaotic lifestyle, which included living with five different men and residing in ten different cities in the three years before trial, despite fact that mother had resided in same town and held steady job in the year and a half before trial); *Heiskell v. Kendrick*, No. 14-06-00972-CV, 2007 WL 3072002, at *4 (Tex. App.—Houston [14th Dist.] Oct. 23, 2007, no pet.) (mem. op.) (holding that there was sufficient evidence that father's appointment as managing conservator would significantly impair the children's physical health or emotional development because father had physically attacked mother on a number of occasions, had made only sporadic visits to the children following separation from mother, and had failed to provide adequate financial support for children).

We therefore overrule Mother's single compound issue.

## IV. CONCLUSION

Having overruled Mother's sole issue, we affirm the trial court's judgment appointing Aunt as managing conservator of X.V.

SUE WALKER<br>
JUSTICE

PANEL:   DAUPHINOT, WALKER, and MEIER, JJ.

DELIVERED:   August 12, 2010